May it please the court, for the record my name is Kevin O'Connor, Picard, Kinson, Rowe, LLP, counsel to the Ad Hoc Shrimp Trade Action Committee which I will refer to today as ASTAC. The immediate purpose of the appeal before this court is to obtain a determination to remand this case to the CIT so that I can do what it failed to do in the first instance, which is to determine whether the challenged aspects of Commerce's final results were or were not supported by substantial evidence on the record or otherwise in accordance with law. While ASTAC's ultimate goal is to have the final results of the first administrative review of the underlying anti-dumping order amended, we are not requesting this court to rule on the substance of the challenged aspects therein. Rather, we recognize that obtaining the ultimate goal requires a multi-step process that must include sufficient review of the issues by the CIT. In its brief, the government acknowledged this necessity when it stated that the trial court should have addressed the merits that it is unaware of any basis under which to challenge the trial court's jurisdiction and that remand is appropriate here. The government compared the current case to Ad Hoc Shrimp Trade Action Committee v. US, a 2008 decision in which this court remanded the matter to the CIT to address the merits of Ad Hoc's claims which, like here, it failed to do in the first instance. We review these decisions, de novo, looking at the record. Why isn't there enough on the record for us to reach the merits and sustain with some deference the decision of Commerce to use the NACA as the basis for its decision. You're right, Your Honor. This record here below from a clean slate, however, it has stated, I think, numerous times that it usually begins its de novo review with the informed opinion of the CIT. ASTAC believes that the reason this is so is because Congress has established a system of reviewing anti-dumping orders by which the CIT is an integral part. This is their specialty. This forms the majority of their docket of cases, and especially in a case like this where one of the issues involves a departure from policy, we think that the CIT's specialized review is especially appropriate here. What was the departure from policy? The departure from policy had to do with the second issue which ASTAC challenged below, which was the decision to exclude Bionic's financial statements in their entirety. I know the government and Grobest have argued that this was not a change in policy but a clarification in policy, and they both acknowledged that Commerce's application of that policy has been inconsistent in the past. The reason it has been inconsistent is because Commerce's policy has been to evaluate the totality of the case on a case-by-case basis and not simply have a per se rule to exclude the entire financial statement of a company that has shown zero or negative profits during the period under question. So now they've adopted a per se rule. What's wrong with that? Well, they've adopted a per se rule which, you know, I think opposing counsel has argued here that it actually does away with the fear of arbitrary decisions by Commerce. We don't believe it's arbitrary decisions but sound decisions. The reason Commerce has looked at these on a case-by-case decision in the past is because there may be some cases where a company that has shown zero or negative profits, their entire financial statement may be tainted for these purposes. However, there might be circumstances where they are not. I think Commerce said that the underlying profit is a direct result of the SG&A expenses, the overhead, the other things here which they have decided to exclude. However, profit can also be a product of other things. Things out of, I guess, unforeseen circumstances, profit can be a result of what their selling price was, a number of things. So we believe that Commerce's practice in the past to actually look at these things on a case-by-case basis is a very sound decision. Well, but that, again, to follow up on Judge Dyke's question, that is merely to say that you disagree with what Commerce has decided to do by way of a modification of its policy. You're not suggesting that Commerce is being arbitrary and capricious and just applying one policy in one day and another policy the next day and with no consistency. They're simply employing the practice, it seems to me, of what agencies do fairly typically and that is to refine their approach to the problems that confront them and where necessary change policy. Isn't that what's going on here? Interesting, I don't think so, Your Honor. Here we actually have the preliminary results in which Commerce actually included the financial statements of Bionic. The fact that they changed midstream with respect to this review shows that, you know, there really is a reason why, you know, you may look at the entire financial statement totality, the circumstances for each and every case. Why does the fact that the change occurred at that particular time, the change in policy, indicate that it isn't an ordinary change of policy? I'm not sure I follow that. I'm not sure that it does matter that that is the fact that it happened at that case in time is what matters. The inconsistent application of rules is one thing where an agency may, on even-numbered days, apply Rule A and on odd-numbered days apply Rule B and somebody can come in and say this is arbitrary and capricious. You're not applying a rule consistently. It's another thing to say that the agency has decided what we've been doing is not really as effective as another approach. Here's the new approach we're going to follow, regardless of when that decision is made, whether it's after a preliminary decision or not. That still is, in the world of judicial review of agency action, that is not considered an impermissible agency act, typically. No, I agree, Your Honor. Agencies certainly can change their policies. So what is it about this or the lack of consistency and so forth that, independent of the merits of the position, impeaches the change? We think it's the actual policy itself, not necessarily the way it was made, but the policy itself. Okay, so you're really ignoring, I mean, you're suggesting to us that we should ignore the fact that this is a new policy and so forth. It's the fact that you don't like the policy and you think it's wrong. Well, I think on one hand, remand is appropriate because with a change in policy, the CIT and its specialized expertise should review that change in policy. However, if you were to rule on the merits here, we think the policy itself is not correct. You know, we have set forth an example in our briefs and I think it really hammers home the point. This policy essentially says if you have one company that showed zero profit in the period of one year, and then another company that for all other reasons was very similar but showed one dollar of profit, you could use that financial statement. And that seems like an unjust result. And I think a similar way of looking at that is you could take the same company who showed zero profit in one year and one dollar of profit the next year. In one year, their financial statement was not usable, but in the next it was just fine to be used. So we think that this really argues for the need to look on a case-by-case situation of the totality of the circumstances and see are the other items in the financial statement outside of profit actually tainted for these purposes. The other issue that NACA challenged at the CIT had to do with Congress's use of the NACA survey data as opposed to the APEX data, which was also on the record in which ASTAC suggested to be used. And the other Vietnamese party in this case also called this the gold standard and argued for it. Why wouldn't there be certain logic in taking the NACA study which covers the eight major shrimp producers and gets information from over 200 Bangladeshi shrimp industry participants rather than just one? Actually, just a correction, Your Honor. It was not the eight major Bangladeshi shrimp producers. There were eight shrimp producers, but actually only one of those eight accounted for significant production in Bangladesh. Also out of those eight, four of them didn't even export product to the United States. So there's plenty of reason why the NACA broad market average... They cover the five major shrimp producing regions of Bangladesh. There's just a certain logic of having a report that covers a spectrum of the market as opposed to one company. Absolutely. I'm sure if I were in your position, I would pick the one company that makes your case best and go after that, which APEX may well be. Why wouldn't we sustain an action that seems to look at a broader spectrum of the market? Well, because, Your Honor, simultaneous with Commerce's final results in this review was their final results in the review of shrimp from China in which they stated that using a broad market average is only acceptable and they said if and only if the information is reliable. Now we have set forth a number of reasons why we don't... It's not audited? Excuse me? Your contention is it's not audited? Well, we think the fact that it's not audited is part of it. This was a voluntary study which was done so producers could or could not participate. The NACA study actually talks about the general accuracy of prices. General price information is what was verified. We argue that it is not reliable because there's no evidence on the record that the prices are tax exclusive, which the required debate. We think there were a number of reasons. Also, it did not cover all the shrimp count sizes that are in question here. So what happened is they had to fill that hole through extrapolation. What we had was an audited financial statement of a major producer who exported... Are you contending that the APEX data should have been combined with the NACA study? No, we think that the APEX data should have been used on its own because that was audited reliable data. By combining it with data that we think on its own is unreliable would not have cured this situation here. What is the status of the... This is the first administrative review that we have before us. What is the status right now of the second and third, all of which I guess are cascading along? I cannot speak to the exact status, but a number of these are still ongoing. There are... Well, I guess in the briefs there was a reference back in September, I think. The second was before the CIT already and it's one of the reasons that Judge Aquilino... Well, was the reason that Judge Aquilino declined to reach the merits here because these issues were going to be resolved in short order as he saw it. Now, have they been resolved? Has this second administrative review been decided already in the... during the pendency of this appeal? I believe the second administrative review is still being appealed. You mean it's still before the CIT? When you say appealed, it's proceeding before the CIT. It is proceeding before the CIT. I know the question at the CIT with respect to the second administrative review, which is similar to this review, is the use of the NACA data. Right. I know it has... Your Honor, I can't answer that question. I... Maybe your opposing counsel can help us out. Okay, I guess I will close up my comments right now by stating that... that opposing counsel in this case, both the government and Grobest, have acknowledged that the CIT did not do its job well, that we should have had a decision. And interestingly, and this goes to your question before, Your Honor, about whether or not a... an agency can change its decision midstream. And Grobest stated in its brief that when it does change a policy on how it administers... You want to save any rebuttal time, Mr. O'Connor? Yes, actually, I will, Your Honor. Thank you. May it please the Court, the United States does not object to a remand for the trial court to address the merits in the first instance. Did you suggest to the Court of International Trade that it not decide the issue? No, we did not. We briefed only the merits before the Court of International Trade. This was a sui sponte decision. Where are things with respect to the second and third administrative review? With respect to the second administrative review, the court, a different judge in the trial court, remanded with respect to a different issue. And I believe that Ad Hoc dismissed its claims concerning the financial statements was not before the court in the second administrative review. The NACA data issue was? The NACA data issue was, but I believe that Ad Hoc was arguing that Commerce should not use NACA data and should use a different data source, not the APEC data that it advances in this case. So we believe both of those issues are no longer before any court. And anyhow, under the statutory scheme, what Ad Hoc is attempting to do is have the rate of duty that will ultimately be assessed for one company's exports increased for those exports made between 2004 and 2006, and the statute envisions that relief being available. So we don't object to Ad Hoc having its day in court on those issues. Could you help me understand this financial ratios point? As I understand it, we're talking about the G&A expense and profit, right? That's correct. So what what is what happened in the past when you did use the financial statements for companies that didn't have a profit? Would you just use the G&A figure from those things, or would you actually take the negative profit and offset it against the profit for profitable companies? Commerce would not use the profit from the unprofitable companies. So they never used the profit? That's correct. So it's only a question of whether they should use the G&A? That's true, yes. And why does the lack of profit render the G&A figure unreliable? Well, Commerce explained at page 45 of the appendix that there's really a ripple effect. So if there's an unprofitable company, it'll have difficulty getting credit. There might be other reasons that, and so what would occur is that the financials of the company would be distorted by the fact that it was losing money. In fact, in this case, if you look at page 52 of the appendix, Bionic, the company that Ad Hoc seeks to have added into the financial ratios, only operated for a short period during the year and was having trouble obtaining credit and had been suffering a long decline in profits. So Department of Commerce recognized that fact, and because of that, issued or decided that G&A expense would be inflated as the risk. It would be inflated, yes. It would be harder to borrow money, and so it wouldn't be indicative of what a healthy company's performance would be. And so the Department of Commerce said, well, if we have other good usable data on the record, why should we go to these iffy data sets that involve companies that were losing money? Because we have reliable information on the record, and as Commerce explained at page 49 of the appendix, those data, the good data that are on the record, have to otherwise satisfy Commerce's preferences for surrogate value. So we know these data are good. Not only that the company's making money, but we know that the data are good as well. And what is the state of the sequence of events with respect to Commerce's change of position with respect to this issue? Is this something that there's a reference to inconsistent practice, the case-by-case Commerce's progression from the case-by-case to the present rule? Well, in the preliminary results, Commerce didn't really provide any detailed explanation. There's a history to this, I guess. There's been, in other cases, this question of profitability. That's correct. And in other cases, Commerce had explained that it had a preference, but it had applied this preference inconsistently, as Commerce noted in its decision memo. In fact, it applied, it did not apply that preference in the preliminary results. Then in the final results, after this issue was briefed by the parties in their case briefs, Department of Commerce issued a final determination where it expressed its new rule that if there are otherwise good data on the glean financial ratios, then the agency is not going to use financial statements of unprofitable companies. And although we believe it was a clarification of the agency's preference, which was enshrined in a policy, to the extent it's any change in practice, this court noted in yet another ad hoc shrimp case, 596 F 3rd 1365, citing the FCC v. Fox, it's not a difficult standard for an agency to meet to change a past practice. All the agency has to do is explain why it's changing its practice. I'm sorry. I was going to note that Mr. Nicely was to argue too. Oh yeah, let me withdraw. Yes, did I start with 10 minutes or? No, you Well, if the court has no further questions, I'll make a bequest to Mr. Nicely of three minutes and 30 seconds. Then I will, if the court has no further questions for the government, I will yield the remainder of my time. Thank you, Mr. Ticini. Mr. Nicely. Good morning. If it is the court, I'm Matt Nicely from Thompson-Hind, representing Grovest and Yme Industrial Vietnam. I think what I have to offer, in addition to what you've seen in the briefs and in support of what the government decided in this case, and what differs in terms of our our position before you today, is that we don't think you should be taking the time to remand this back to the position is quite simple. We think it's a unique situation. We think the court did address the issues. It may not have gotten to all of them. It may have misunderstood some of the issues, but it it did get into, at least on the topic of the NACA study, it addressed it at least slightly. The question though, how did it come out? Well, it came out that they decided, that the judge decided it, in effect, that the issue was that the NACA study in particular was going to be on appeal later, and that he therefore didn't need to address it. Yeah, you say he addressed it, and now you say he didn't need to address it. I didn't see him addressing it. I do see that he said that he didn't need to address it. On page 8 of his decision, he did say the court would have this, the plaintiff would have this court order the ITA to rely solely on information for Apex Foods to the exclusion of data for other such processes. That's their position. That's an accurate statement of their position. Yes. So, but I thought you were going to tell me that he actually decided this issue. He obviously didn't go into great detail. Well, okay, where did he decide it, if he decided it? He stopped short of going through what I think everyone would agree would be a full analysis. He stopped short of deciding. Agreed. Yet, I don't think what we have here is, we don't have a question of jurisdiction. I believe that this is a different situation than the other ad hoc case that the plaintiffs have raised. We have a situation in which you are being asked to apply a de novo review, and you have the ability to apply de novo review. The merits are before you. There's no decision to review yet, is there? I'm sorry? But there's no decision to review yet, is there? How do you mean there's no decision to review? Well, he hasn't decided what is the status of the NACA study. How can we assess that to see if it's correct or not? Under your standard of you would seek to review what the Commerce Department decided in any event. Suppose that the Court of International Trade, frustrated with this court, decided that this business of complete de novo review of commerce has gotten out of hand, we're getting reversed too often by the Court of Appeals, and let's just let them, since they have de novo review, let's let them make the decisions in the first instance, and then we'll, if they send those cases back to us, we'll take it from there. Why isn't what you're suggesting an invitation for them to do exactly that? I, perhaps it could be. I think we have a unique situation with a particular judge. That wouldn't be a good idea, would it? No, it would not be a good idea for us. No, I agree with you. We get a lot of benefit. But that is implicit in this standard, isn't it? It's, well . . . That's what the standard requires. It tells us to go back and redo . . . But I think . . . the work of the Court of International Trade without reference to the Court of International Trade. And I agree, if you were to receive decisions like this on a repeated basis, then you would have good cause for that concern. But I think this is a unique situation. The judge did not go through the analysis like he should have. However, what I think needs to be balanced here is not merely in just the interests of how the judicial system works right here, but also the interests of the parties. The judge didn't even hold oral argument, did not . . . took two years to decide a case that, frankly, I think everyone in the room would agree was a relatively simple case, a very straightforward case. What you're . . . what you would be doing in this case would be subjecting particular respondents, who are the ones who are affected by litigation, which frankly is only in the interests of the plaintiff, because it maintains . . . it continues to suspend liquidation. It continues to leave uncertainty in the marketplace as to what the standard is because of pending litigation. So what . . . and what would happen if it went back to the . . . to the CIT? You would have them decided again, perhaps this time decided completely, and it would be appealed back to you again. You'd be asked to do the exact same thing we're here to talk about you doing today, which is to effectively, under your de novo review standard, review what the Commerce Department decided. How long will all of that take? This is already 2007 when this case was was originally appealed, and how much longer do the parties have to wait to have finality? There is an issue here of economic interest of the parties, particularly the respondents, of how long you will allow litigation to be prolonged. And in this instance, you have the ability, in what I view as a unique situation, you're not setting a precedent. It's a unique situation. You have the ability to decide the case, tell the judge, the CIT, that you decided this wrongly. Your result was correct. We also agree we should sustain what the Commerce Department decided. However, the way in which you went about deciding it was incorrect. And you can, in the process, also admonish the CIT for effectively wasting the court's time in going through that process. But that, I think, is in the best interest of the parties and is not inconsistent with the role that you would play in any event. If I have a little bit more time, I would I would merely say, first of all, I think that counsel for the government has already addressed sufficiently the issues, the merits of the plaintiff's on the financial ratios. The NACA study, counsel for the government didn't get into in great detail, but we agree with their position, of course, that the Commerce Department was correct to rely upon the NACA study. I don't know that if you have any questions, I'm happy to address them, but I think it's fairly clear that the plaintiffs have simply, are simply saying they like their that show that the NACA study, that the choice of the NACA study by the Commerce Department was an unreasonable decision. The Commerce Department clearly followed its standards, the factors that it routinely applies in deciding which are the best surrogate values to use, and we think their decision should be upheld. Thank you, Mr. Nicely. Honor, you have a little over a minute remaining. Thank you, Your Honor. Just briefly, I think Judge Bryson made the point here that this court shouldn't be saddled by, with the requirement to review commerce decisions in the first instance. That is not the purpose of this court in the, in the system that has been established. I address for just a minute Mr. Nicely's rather troubling recitation of the delays and, and the perpetual jeopardy that the marketplace is placed in when the court does what apparently has happened below. We absolutely agree that it's unfortunate that there has been this delay. If the CIT had fulfilled its obligation... How should this court respond to that? We still believe that we must look, I think... Perpetuate the delay. Not perpetuate the delay, but Groves talks about judicial economy, and judicial economy has to be more than about this one case. If this court tells the CIT... We can put an end to the delay without departing at all from our standard review, isn't that correct? But the CIT would not be encouraged to actually perform its obligation with the standard review in future cases. We could tell them to do that, couldn't we? Yes, you could tell them to do that. I personally, I believe that the, the more sound decision would be to send this back to the CIT. They are an expert, an expert court that, that, that has been established to make determinations on these anti-dumping orders. Do you think the question of whether we should send it back or follow counsel's suggestion, Mr. Nicely's suggestion, that we treat this as a one-off type exceptional case, turns in part or in whole on how difficult we think the substantive issues are? Perhaps should, but I don't agree with Mr. Nicely that this is a one-off case. We had, which has been cited by both sides, Ad Hoc Sherm Trade Action Committee, BUS. That was decided by this court in 2008 where the federal, I'm sorry, where the CIT essentially did the same thing. It decided... I don't know, that seemed to me a rather different situation. There was some criticism, but... Oh, well, go ahead. But, but I think it was a situation where the CIT, like here, did not perform the standard of review because they said, well, you know, us performing the standard of review is not going to take care of the situation. This court did send it back down then, and I don't think the message was heard by the CIT in that instance. Thank you, Mr. O'Connor.